IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CR-203 (LMB) |
| | ) | |
| LATIF MOHAMED CHOWDHURY | ) | |
| a/k/a "Gulam Latif Chowdhury," | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

Counsel for Defendant Latif Chowdhury, by and through the undersigned counsel, respectfully submits this memorandum in aid of sentencing in this case.  For the reasons set forth below, Mr. Chowdhury respectfully asks the Court to impose a below-Guidelines sentence no greater than 12 months and a day's imprisonment, followed by a three-year term of supervised release.  He also respectfully asks the Court to forgo the imposition of a fine because he lacks the financial means to pay a fine.  Lastly, Mr. Chowdhury respectfully asks that he receive credit for time served, and that the Court recommend he be designated to a minimum-security camp at FCI Cumberland in Cumberland, Maryland, if consistent with Bureau of Prisons policy.

## I.      PRELIMINARY STATEMENT

The United States is afflicted by an epidemic of opioid drug addiction that has devastated communities across our country.[1]  In the Commonwealth of Virginia alone, this crisis claims the lives of over 1,000 people each year.[2]  Understandably, the Department of Justice has made the prosecution of those who unlawfully distribute opioids a top national enforcement priority.[3]

But the actions of the defendant in this case, Latif Chowdhury, did not contribute to, further, or exacerbate, our nation's opioid epidemic.  Mr. Chowdhury is guilty of unlawfully distributing Schedule II controlled substances without a pharmacist's license at Alexandria Care Pharmacy ("ACP-1"), the pharmacy he owned in Alexandria, Virginia.  As indicated in the Statement of Facts incorporated within his plea agreement, Mr. Chowdhury essentially stepped into the shoes of a frequently absent, licensed pharmacist – his employee – to keep the pharmacy running in the pharmacist's absence.

---

[1] *See About the Opioid Epidemic*, U.S. Dept. of Health and Human Services, https://www.hhs.gov/opioids/about-the-epidemic/index.html (last updated Sept. 4, 2019); *Opioid Crisis*, Health Resources & Services Administration, https://www.hrsa.gov/opioids (last updated June 2019); *Ending America's Opioid Crisis*, The White House, https://www.whitehouse.gov/opioids/ (last visited Sept. 15, 2019).

[2] *See Governor Northam Announces Expansion of Data-Sharing Platform Designed to Help Virginia Fight the Opioid Crisis*, Virginia Governor website (August 26, 2019), https://www.governor.virginia.gov/newsroom/all-releases/2019/august/headline-845796-en.html.

[3] *See* Byron Tau and Aruna Viswanatha, *Investigators Use New Strategy to Combat Opioid Crisis:  Data Analytics*, Wall Street Journal, Aug. 26, 2019, https://www.wsj.com/articles/investigators-use-new-strategy-to-combat-opioid-crisis-data-analytics-11566811803; Katie Benner, *Snaring Doctors and Drug Dealers, Justice Dept. Intensifies Opioid Fight*, The New York Times, Aug. 28, 2018, https://www.nytimes.com/2018/08/22/us/politics/opioids-crackdown-sessions.html; *Attorney General Sessions Announces Operation Synthetic Opioid Surge*, U.S. Attorney's Office, Eastern District of Tennessee (July 12, 2018), https://www.justice.gov/usao-edtn/pr/attorney-general-sessions-announces-operation-synthetic-opioid-surge.

Mr. Chowdhury's actions were unlawful, and he comes before this Court ready to accept the imposition of sentence for the crime to which he has pleaded guilty.  However, no known harm came to anyone as a result of Mr. Chowdhury dispensing medications without a pharmacist's license.  This is not a case, for example, of a pharmacist who forged or altered prescriptions for opioids in furtherance of a drug trafficking scheme, disseminated opioids to opioid addicts without a legitimate prescription, or turned a blind eye to red flags of diversion or abuse.   By all accounts, medications that Mr. Chowdhury dispensed were lawfully prescribed and properly dispensed to authorized end users.  Indeed, if the licensed pharmacist at ACP-1 ("Pharmacist-1") had been on duty consistently, she would have lawfully dispensed the same medications to the same end users that Mr. Chowdhury did.  Not surprisingly, as noted below, the defense is unaware of any prior Department of Justice criminal prosecution, in any district in the United States, of a pharmacist (or pharmacy owner or operator) for unlawful distribution of lawfully prescribed medications on the facts before this Court.

In sum, Mr. Chowdhury's offense conduct could not be more different from those of the defendants in the typical opiate distribution cases that are prosecuted across this country every day. Mr. Chowdhury therefore respectfully asks this Court to impose a sentence truly proportional to the specific facts of this case.

## II.    THE SENTENCING GUIDELINES AND 18 U.S.C. § 3553(a) FACTORS

The overarching principle governing the sentencing of Mr. Chowdhury is the need for this Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]."  18 U.S.C. § 3553(a).  Those factors concern "the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care,

or other correctional treatment in the most effective manner…." *Id*. § 3553(a)(2).

In addition to considering those factors, the Court must consider all the other factors

specified in 18 U.S.C. § 3553(a):

- "[T]he nature and circumstances of the offense and the history and characteristics of the

defendant";

- "[T]he kinds of sentences available";

- [The applicable Sentencing Guidelines range];

- "[A]ny pertinent policy statement [issued by the Sentencing Commission]";

- "[T]he need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct"; and

- "[T]he need to provide restitution to any victims of the offense." *Id*. § 3553(a).

The Court reasonably may accord significant weight to any single sentencing factor.

*United States v. Pauley*, 511 F.3d 468, 476, (4th Cir. 2007) (citing *United States v. Gall*, 552 U.S.

38, 59 (2007)).  But while the Court must consider the Sentencing Guidelines, the Guidelines are

merely advisory.  *Id*. (citing *United States v. Booker*, 543 U.S. 220, 258-64 (2005)); *see United

States v. Martinovich*, 810 F.3d 232, 243 (4th Cir. 2016) ("When a district court has treated the

Guidelines range as mandatory, the sentence is procedurally unreasonable and subject to

vacatur.").  The Sentencing Guidelines, therefore, are simply one factor among all the other

statutory factors to be considered by the Court imposing a sentence.  *See United States v. Kimbrough*, 552 U.S. 85, 101 (2007) (noting that while §3553(a) requires the sentencing court to give due consideration to the Guidelines, *Booker* allows the sentencing court to fashion the sentence in light of other statutory considerations).  Indeed, in fashioning a sentence, a district court "may not presume that the Guidelines range is reasonable." *Pauley*, 511 F.3d at 473 (citing *Gall*, 552 U.S. at 49-50); *see Nelson v. United States*, 555 U.S. 350, 350-51 (2009) (district court may not apply a "presumption of reasonableness" to a within-Guidelines sentence).  And a district court's consideration of all the § 3553(a) factors may warrant a downward variance.  *See United States v. Smith*, 27 Fed. Appx. 184, 187-88 (4th Cir. 2008).

## III.    APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

### A.  18 U.S.C. § 3553(a)(2) Factors

A below-Guidelines sentence of 12 months and a day would be sufficient to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

> **1.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

Mr. Chowdhury acknowledges that his offense conduct was serious.  He filled and dispensed pharmacy prescriptions despite the fact that he was not a licensed pharmacist, in violation of federal and Virginia law.  He also submitted fraudulent claims for insurance reimbursement.

But it is essential for the Court to understand and assess the full context of Mr. Chowdhury's offense conduct in order to impose a just sentence proportional to that conduct.  As a preliminary matter, Mr. Chowdhury did not set out to engage in a criminal scheme when he opened the Alexandria Care Pharmacy locations in Alexandria ("ACP-1") and Arlington ("ACP-

2"), Virginia.  As he did at ACP-2, Mr. Chowdhury sought to hire, and did hire, an experienced, licensed pharmacist to staff Alexandria ACP-1.  *See* Exh. 1 (text messages between Mr. Chowdhury and "Pharmacist-1," the second pharmacist at ACP-1; Exh. 2 (Pharmacist-1's pharmacist license for ACP-1).[4]  From the time that ACP-1 opened in approximately December 2013 until approximately August 2015 -- a period of approximately one year and seven months – a licensed pharmacist regularly staffed ACP-1.  *See* Exh. 3 (checks issued to licensed pharmacists at ACP-1 from January 2014 to July 2015).

If a licensed pharmacist at either pharmacy was unable to report for work on schedule, Mr. Chowdhury made good faith efforts to find a timely replacement.  *See* Exh. 4 (text messages between Mr. Chowdhury and pharmacists at ACP-2 regarding pharmacist coverage there).  Mr. Chowdhury also was conscientious in complying with tax and regulatory obligations regarding the two pharmacy businesses.  *See* Exh. 5 (check payments to Treasurer of Virginia, Fairfax County, Virginia Employment Commission, and Virginia Dept. of Taxation).

As Mr. Chowdhury acknowledged in his plea agreement, "[d]ue to significant health-related issues, Pharmacist-1 ceased working full-time at ACP-1 beginning in or around August 2015 and thereafter was absent from the pharmacy for considerable periods of time."  Statement of Facts ¶ 6.  But Pharmacist-1 continued to work at ACP-1 from time to time, as evidenced by multiple checks that Mr. Chowdhury issued to her, or on her behalf, from September 2015 to January 2016 for services rendered.  *See* Exh. 6.  In addition, amidst the disruptions caused by Pharmacist-1's absences, Mr. Chowdhury made good faith efforts to hire another full-time

---

[4] Filed defense exhibits have been redacted pursuant to Local Criminal Rule 47 and Rule 49.1 of the Federal Rules of Criminal Procedure.  Unredacted copies of exhibits have been provided to the government and are available to the Court.

pharmacist for ACP-1.  *See* Exh. 7 (text messages between Mr. Chowdhury and potential candidates for pharmacist position).

As in the Statement of Facts accompanying his plea agreement, Mr. Chowdhury acknowledges that on certain occasions he dispensed Schedule II controlled substance medications at ACP-1 without a licensed pharmacist, and that this conduct was unlawful.  But his conduct with respect to dispensing prescription medications was no worse than that.  This is not a case where a pharmacist was covertly distributing controlled substances to criminal drug dealers or other parties intending to disseminate or otherwise make unlawful use of such drugs. Nor is this a case where a pharmacist ignored red flags of diversion or abuse of controlled substances that the pharmacy dispensed.  Critically, at no time did Mr. Chowdhury ever dispense Schedule II controlled substances – or any other prescription medicines – to anyone without a valid prescription.  Indeed, ACP-1 maintained a written policy at the pharmacy containing a checklist of warning signs for an abnormal prescription or indications that at prescription would not be used for medical purposes, *see* Exh. 8, and Mr. Chowdhury sometimes turned away individuals who came to ACP-1 with prescriptions he believed were of suspect authenticity.

Although the description in the Statement of Facts regarding the distribution of Schedule II controlled substances to minors (*see* Statement of Facts ¶16) is literally true, it is misleading. What the Statement of Facts omits is that these medications were distributed for minors who had *legitimate prescriptions*, and it was their parents who brought these prescriptions to ACP-1 to be filled.

Although not an offense of conviction, Mr. Chowdhury also recognizes his culpability for filing false claims for reimbursement to insurance companies for prescriptions not issued to patients.  *See* Statement of Facts ¶ 11.  Without question, he should have understood, at the time,

the wrongfulness of these actions.  As punishment, he already has consented to a forfeiture order

for $500,000, corresponding to pharmacy revenues from the unlawful and fraudulent filling and

dispensing of prescriptions from approximately August 2015 to February 2016.  *Id*. ¶17.

In considering what weight to assign to this uncharged conduct at sentencing, however, the

Court, respectfully, should consider two factors.  First, on information and belief, Mr.

Chowdhury did not embark on this conduct when he opened ACP-1, or engage in it for the first

several months thereafter.  Rather, he did not engage in any fraudulent insurance billing until

after Pharmacist-1 replaced the original pharmacist at ACP-1 and became the registered

pharmacist there in April 2014.  It was Pharmacist-1 who told Mr. Chowdhury how to increase

pharmacy revenues by submitting fraudulent claims to health insurance companies.[5]  Second, on

information and belief, none of the fraudulent claims for insurance reimbursement concerned

controlled substances.  *See* Presentence Investigation Report ¶ 38 (filed Aug. 30, 2019) ("refills

of topical prescription medications") (hereafter "PSR").

    Lastly, the Court should consider Mr. Chowdhury's age at the time of the offense

conduct.  In August 2015, when Pharmacist-1 stopped working full-time at ACP-1 and Mr.

Chowdhury continued to operate the pharmacy in her absence without a licensed pharmacist, Mr.

Chowdhury was barely 25 years old.  Although an adult, he lacked the judgment borne of greater

experience to fully appreciate at the time the wrongfulness of his conduct. *See United States v.*

*Richardson*, 299 Fed. Appx. 239, 239 (4th Cir. 2008) (affirming district court's downward

variance based partly on defendant's youthfulness).

---

[5] Mr. Chowdhury brings this information to the Court's attention not to diminish his own
culpability for this conduct; he affirmatively took action on his own to submit fraudulent claims
to health insurance companies.  Rather, he simply wants the Court to have the full factual context
in which to consider this conduct for purposes of sentencing.

Given these important contextual considerations, a below-Guidelines sentence of 12 months and a day, followed by a term of supervised release, would reflect, and be proportionate to, the true seriousness of Mr. Chowdhury's offense conduct, promote respect for the law, and provide just punishment.

### 2. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

A sentence of imprisonment of more than 12 months and a day will not do more to promote general or specific deterrence.   With respect to specific deterrence, Mr. Chowdhury's criminal conduct is already far behind him.  After the closure of his two pharmacies in February 2016, he "turned over a new leaf" and concentrated his entrepreneurial energy on the real estate development business, focusing on the renovation of homes for resale and the management of rental properties.  *See* PSR ¶ 75; Exh. 9 (Letter from Curt Morton to the Hon. Leonie M. Brinkema (hereafter "Morton Letter")).  Moreover, the impact of his criminal prosecution --- particularly his separation from his family since his incarceration following his arrest on July 3, 2019, and the corresponding loss of family income[6] -- has been devastating for his family, particularly his wife and seven-month-old son.  *See* Exh. 10 (Letter from Ayesha Faisal to the Hon. Leonie Brinkema, Sept. 6, 2019 (hereafter "Faisal Letter")); Exh. 11 (Letter from Kaneez Fatima to the Hon. Leonie Brinkema, Sept. 6, 2019 (hereafter "Fatima Letter)).  Mr. Chowdhury is committed to leading a productive, law-abiding life in the business world, and in light of what has befallen him in this case, he poses no risk of offending again. *See* Exh. 12 (Letter from Jeff Stahle to the Hon. Leonie M. Brinkema, Sept. 10, 2019 ("very motivated to grow in the real estate business") (hereafter "Stahle Letter")); Exh. 13 (Letter from Mohamed Kibriya to the Hon.

---

[6] Mr. Chowdhury was the sole source of income for his family.

Leonie M. Brinkema ("[H]e has already learned lessons from his first business and continued to grow in a direction that did not jeopardize his morals.")); Exh. 9 (Morton Letter) ("I have observed Latif working diligently over the past three years to succeed in the real estate industry.").

Nor would a sentence greater than 12 months and a day foster general deterrence.  Social science research indicates that long prison sentences do not promote general deterrence.  *See* National Institute of Justice, *Five Things About Deterrence* (Sept. 2014) ("The certainty of being caught is a vastly more powerful deterrent than the punishment."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crim. & Just. 199, 201 (2013) ("[T]here is little evidence that increases in length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs."); Brennan Center for Justice, *What Caused the Crime Decline*? 26 (Feb. 2015) ("Empirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes."). Furthermore, a press release like the one issued by the U.S. Attorney's Office in this case following Mr. Chowdhury's guilty plea is likely to have a considerable chilling effect among pharmacy owners in this district who might otherwise contemplate dispensing medicine without a licensed pharmacist.  *See* https://www.justice.gov/usao-edva/pr/former-pharmacy-owner-pleads-guilty-fraudulently-dispensing-opioids ("Former Pharmacy Owner Pleads Guilty to Fraudulently Dispensing Opioids").  Local news media, moreover, published stories about Mr. Chowdhury's guilty plea, thereby widely disseminating information about the government's criminal enforcement action to other pharmacy owners and operators.  *See* https://www.wusa9.com/article/news/former-pharmacy-owner-in-alexandria-pleads-guilty-to-

illegally-dispensing-opioids/65-86ee459e-ee71-4a49-bd42-74ce0b4dfe54;

https://coveringthecorridor.com/2019/07/alexandria-care-pharmacy-opioids/.

### 3. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

Mr. Chowdhury poses no risk of offending again.   In that regard, the Court already has a

factual basis for confidence in Mr. Chowdhury's future as a law-abiding citizen.  Between the

closure of the two pharmacies in February 2016 and Mr. Chowdhury's arrest in July 2019, Mr.

Chowdhury conducted legitimate, lawful business activities.[7]  *See* Exh. 12 (Stahle Letter); Exh. 9

(Morton Letter); Exh. 23 (Letter from Joseph N. Obiora to the Hon. Leonie M. Brinkema, Sept.

9, 2019 ("He showed an admirable commitment in the way he managed his real estate

transactions to ensure that he promptly paid back lenders that financed his purchases.") (hereafter

"Obiora Letter")).  As noted above, he refocused his entrepreneurial energies on the real estate

business, concentrating on the purchase and renovation of homes for resale and the management

of rental properties. *See* PSR ¶¶ 75-80.  As Mr. Chowdhury will affirm to the Court at

sentencing, he is dedicated to leading a productive, lawful life as a businessman after the

completion of his sentence.

### 4. The Need for the Sentence Imposed to Provide the Defendant With Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

A below-Guidelines sentence of 12 months and a day would be sufficiently lengthy to

provide Mr. Chowdhury with additional training and education to strengthen his capabilities for a

successful reintegration into society.  Indeed, Mr. Chowdhury is eager to pursue any educational

---

[7] It should also be noted that Mr. Chowdhury has been a model prisoner at the Alexandria Detention Center over the 11-week period since his arrest.

opportunities available during his incarceration, as well as self-directed education, to expand his

business knowledge in preparation for professional life after the completion of his sentence.

   B. **Additional 18 U.S.C. § 3553(a) Factors**

      1. **Nature and Circumstances of the Offense**

The nature and circumstances of Mr. Chowdhury's offense conduct are straightforward.

In late 2013, he opened ACP-1 in Alexandria, Virginia, which he owned and operated.  PSR ¶

82.  As noted above, Mr. Chowdhury understood the need to hire a licensed pharmacist to fill

and dispense prescription medicine, and after an initial licensed pharmacist departed, he hired

Pharmacist-1, an individual with many years of experience as a pharmacist.  *See* Exh. 1.

Between approximately April or May 2014 (when she replaced the original pharmacist) and

August 2015 – a period of approximately 16 months  – Pharmacist-1 worked full-time at ACP-1.

Beginning in or around August 2015, however, Pharmacist-1 stopped working full-time due to

health issues.  Statement of Facts ¶¶ 6-7.  Pharmacist-1 continued to work from time to time, *see*

Exh. 6 (ACP-1 checks issued to Pharmacist-1 from September 2015 to January 2016 for services

rendered), but she was often absent from the pharmacy.  In a good faith effort to ensure a

licensed pharmacist was regularly on the job, Mr. Chowdhury conducted a search for another

pharmacist.  *See* Exh. 7 (text messages between Mr. Chowdhury and job candidates).  But Mr.

Chowdhury ultimately did not hire another pharmacist to fill in the gaps when Pharmacist-1 was

not at ACP-1.  Instead, he wrongly filled in himself for Pharmacist-1 when she was absent,

utilizing knowledge he had learned from her to fill and dispense prescriptions, including

prescriptions for Schedule II-controlled substances.

Mr. Chowdhury understands his actions in this regard were unlawful, and that he must

now be held accountable for this conduct.  It is important that the Court understand the nature

12

and scope of his offense conduct, however, in order to impose a sentence proportional to that

conduct.  Mr. Chowdhury did not, for example, forge prescriptions for any controlled substances

that he issued to anyone, or knowingly distribute prescription medications to drug traffickers or

addicts.  Nor did he fill and dispense any prescriptions for medicine for which there was not a

valid, lawful prescription, or ignore red flags of diversion or abuse.

Although not convicted of any other offense conduct, Mr. Chowdhury has also

acknowledged fraudulently billing health insurance programs, including Medicare and Medicaid,

for refills of topical prescription medications.[8]  Statement of Facts ¶ 10.  He further

acknowledged that these prescriptions were not authorized by any physician, nurse practitioner,

or physician's assistant, and were not dispensed to any pharmacy customer.  *Id*. ¶ 11.  Mr.

Chowdhury is deeply remorseful for this conduct, and he understands that the Court may take it

into account at sentencing.   For purposes of context, however, Mr. Chowdhury respectfully

notes that he did not set out to engage in insurance fraud when he opened ACP-1; rather, as

noted above, this conduct did not begin until after Pharmacist-1 began working at ACP-1 in

April 2014.  In addition, the Court already has imposed a heavy penalty for this conduct –

namely, an order to forfeit $500,000 reflecting the proceeds from this conduct, to which Mr.

Chowdhury consented as part of his plea agreement.  Plea Agreement ¶ 10; Consent Order of

Forfeiture (July 10, 2019).  Mr. Chowdhury therefore respectfully asks the Court not to increase

any term of incarceration the Court may impose based on this conduct.

## 2.  History and Characteristics of the Defendant

---

[8] As noted above, Mr. Chowdhury did not submit any fraudulent insurance claims for controlled substances.

Mr. Chowdhury has no prior criminal history, *see* PSR ¶¶ 54-59, and notwithstanding the offense conduct which brings him before this Court, there is much to admire about his personal history.  Mr. Chowdhury has overcome considerable adversity to become a hard-working, entrepreneurial businessman.   He was born in 1990 in Bangladesh, the youngest of 16 children. PSR ¶¶ 63-64.  When he was two years old, his father died from a stroke.  *Id*. ¶ 64.  As a little boy, Mr. Chowdhury lived apart from his mother in Bangladesh with some older siblings.  *See* Exh. 10 (Faisal Letter).

At age nine, Mr. Chowdhury immigrated to the United States with his mother and two of his siblings.  PSR ¶ 66.  For approximately six months, Mr. Chowdhury and his family lived with nine or ten other people in a one-bedroom apartment in New York, before later moving to Michigan.  *Id*.   Mr. Chowdhury had a difficult childhood in the United States; his mother did not work and, although his siblings worked to support the family financially, the family required and received public assistance.  *Id*.; *see* Exh. 14 (Letter from Richi Abdullah to the Hon. Leonie Brinkema, Sept. 3, 2019 ("Latif lost his parents at a young age and has had to raise himself.") (hereafter "Abdullah Letter")).  Mr. Chowdhury's mother suffered a stroke in 2004 (when he was 14 or 15 years old), thereafter was bed-ridden, and died in 2006.  *Id*. ¶¶ 64, 66.  After his mother's death, Mr. Chowdhury lived with his siblings.  *Id*. ¶ 66.

At the time of his arrival in the United States, he had not received any formal education.[9] *See* Exh. 10 (Faisal Letter).  Despite the personal tragedy of his mother's death, Mr. Chowdhury continued with his education and graduated from high school in Warren, Michigan in 2008.  *Id*. ¶ 73.  He subsequently attended Macomb Community College in Warren, where he received an

---

[9] Mr. Chowdhury did not begin kindergarten until age nine, three years later than his peers.  *See* Exh. 10 (Faisal Letter).

associate degree in 2011.  *Id.; see* Exh. 15 (degree certificate); Exh. 16 (Letter from Md Munim to the Hon. Leonie Brinkema (hereafter "Munim Letter")).

Mr. Chowdhury has worked nearly continuously since completing his undergraduate studies, including in jobs where he held positions of trust.  For several months in 2012 and 2013, he held a Top Secret clearance as a government contractor employee at the Pentagon, initially for Omniplex World Services Corporation and subsequently for L3 Communications.  PSR ¶ 86; *see* Exh. 16 (Munim Letter).

After other start-up ventures, Mr. Chowdhury opened ACP-1 in late 2013, and he operated  a second pharmacy, ACP-2, in Arlington, Virginia – owned by one of his brothers – beginning in approximately January 2015.  Mr. Chowdhury regarded the two pharmacies as a means to provide a stable source of his income for his family.  But Mr. Chowdhury also identified the real estate field as an investment strategy for improving the financial fortunes of his family.  *See* Exh. 17 (Letter from Thomas Thou to the Hon. Leonie Brinkema, Sept. 27, 2019 (hereafter "Thou Letter")).  Beginning in 2015, he established and registered real estate investment firms in Maryland, Virginia, and New York.  PSR ¶ 75.  Through these companies, he purchased and sold real estate, and managed rental properties, juggling these ventures with the demands of running the two pharmacies.  *Id*. ¶¶ 75-80; *see* Exh. 17 (Thou Letter); Exh. 9 (Morton Letter).  After the closure of the two pharmacies in February and March 2016, Mr. Chowdhury concentrated full-time on his real estate interests. PSR ¶ 75.

Mr. Chowdhury has a generous heart.  For example, he provided charitable assistance to the village in Bangladesh where he spent the first few years of his life.  *See* Exh. 14 (Abdullah Letter) ("Members of the village came to visit Latif and thank him for what he has done for

them."). He has also provided financial support for the children's soccer team at his mosque. *See* Exh. 18 (check for $700.00).

Mr. Chowdhury also has maintained close ties to his religious community. He sought the guidance of the Youth Director at Dar Al Hijrah Islamic Center, who has counseled him spiritually for the past decade. *See* Exh. 13 (Kibriya Letter).

Family members, friends, and professional acquaintances uniformly attest to Mr. Chowdhury's good character, acts of kindness, and strong work ethic. *See* Exh. 9 (Morton Letter) ("He has successfully purchased many distressed properties…and transformed them from a neighborhood blight into one of the better homes on the block" and "I have found him to be an honest individual"); Exh. 11 (Fatima Letter) ("[He] takes me to the doctor, he gives me rides to work, fixes things around my home when necessary and he extends hands to complete chores spontaneously to give me some relief."); Exh. 12 (Stahle Letter) "[H]e has a good heart, cares for others and tries to do the right thing."); Exh. 13 (Kibriya Letter) ("Latif is special… [H]e has taken big steps in life to do good and follow a righteous path."); Exh. 17 (Thou Letter) (by enrolling in HUD-approved Section 8 program "to create a rental portfolio," Latif "has been helping single moms, low-income families and disabled individuals"); Exh.19 (Letter from Ponko Das to the Hon. Leonie M. Brinkema, Sept. 8, 2019 (hereafter "Das Letter") ("[H]e is a hardworking individual with strong work ethics…and good character…"); Exh. 20 (Letter from Harpreet Bathal to the Hon. Leonie Brinkema, Sept. 6, 2019 (hereafter "Bhathal Letter") ("He always worked side-by-side with his contractors to revamp the properties he was working on," yet "always made sure to be there for [his wife] whenever she needed him."); Exh. 21 (Letter from Shah Shahid to the Hon. Leonie M. Brinkema, Sept. 1, 2019 (hereafter "Shahid Letter") ("I have personally watched him succeed and conduct business in a fair and ethical manner."); Exh.

16

22 (Letter from Jerzy Brniak to the Hon. Leonie M. Brinkema, Sept. 9, 2019 ("I had just moved

to the United States from Poland," and Latif "helped acclimate to my new environment.")

(hereafter "Brniak Letter")); Exh. 23 (Obiora Letter) ("He is a dedicated entrepreneur and

diligently follows through on his business projects and pursuits.").  In one instance when Mr.

Chowdhury was in college, he alone intervened and came to the defense of a young woman who

was being harassed at a bar, even at personal physical risk to himself.  *See* Exh. 19 (Das Letter);

They also underscore that he is a loving husband and doting father to his seven-month-

old son.  *See* Exh. 11 (Fatima Letter) ("Latif takes care of my daughter well, he is very loving to

her," and "shows his sincere to his son and tries to spend time with his son and wife all the

time."); Exh. 14 (Abdullah Letter) ("Latif is an active father working hard to give his son a better

life than what he had."); Exh. 19 (Das Letter) ("I have never seen a father more in love with their

child than Latif.").

### 3.  The Kinds of Sentences Available

An appropriate sentence of incarceration, including a below-Guidelines sentence, is

within the Court's discretion.  There is no mandatory minimum sentence at issue here.

### 4.  Applicable Sentencing Guidelines Range

In his Plea Agreement, Mr. Chowdhury and the government agreed that, pursuant to

U.S.S.G. § 2D1.1(c)(4) (relating to drug quantity), the defendant was involved in the unlawful

distribution of at least 1,000 KG but less than 3,000 KG of Converted Drug Weight,

corresponding to a Base Offense Level of 30.  Plea Agreement ¶5.  In calculating Mr.

Chowdhury's Total Offense Level, the Probation Office correctly decreased his offense level by

three levels (to offense level 27) for acceptance of responsibility pursuant to U.S.S.G. §§

3E1.1(a) and 3E1.1(b).  PSR ¶¶ 51-52.  The Probation Office also correctly determined that there

are no aggravating adjustments warranted for Mr. Chowdhury's role in the offense.  PSR ¶ 40.

However, the Probation Office *incorrectly* increased Mr. Chowdhury's offense level by two

levels for possession of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1).  PSR ¶ 45.  The

defense also objects to an additional two-point enhancement, subsequently instituted at the

government's request, for abuse of position of trust pursuant to U.S.S.G. § 3B1.3.

### a.  Firearms Enhancement

The enhancement specified at U.S.S.G. § 2D1.1(b)(1) is not applicable to Mr.

Chowdhury.  The Application Note regarding that enhancement begins by stating that it "reflects

the increased danger of violence when *drug traffickers* possess weapons," adding that the

enhancement should not be applied when "it is clearly improbable that the weapon was

connected with the offense."  U.S.S.G. § 2D1.1 cmt. n.11(A) (emphasis added).  The heartland of

cases in which this enhancement properly applies are cases involving defendants who were

engaged in drug trafficking activities.  *See, e.g.*, *United States v. Manigan*, 592 F.3d 621, 625,

629-30 (4th Cir. 2010) (defendant "was a substantial drug dealer and, as such, was an offender

who would typically possess a handgun in connection with drug activities"); *United States v.*

*Lipford*, 203, F.3d 259, 272 (4th Cir. 2000) (member of drug trafficking organization shot police

officer during execution of search warrant); *United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir.

1994) ("[T]he law has uniformly recognized that substantial dealers in narcotics possess

firearms…") (internal quotation marks omitted).

There is no evidence in this case – and no allegation by the government – that Mr.

Chowdhury acted as a "drug trafficker."  He was simply a pharmacy owner who, in an effort to

keep his business running, unlawfully filled in for the licensed pharmacist when the pharmacist

was unavailable to work.  The gun was at the pharmacy solely for general self-defense in the

event of an attempted robbery – just as any small businessman in a public-facing business – with an inventory of potential interest to thieves – might have a firearm on the business premises.   It had no connection to Mr. Chowdhury's dispensing of prescription medications in lieu of Pharmacist-1.

Moreover, mere possession of the firearm is not enough for this enhancement to apply. Rather, the government has the burden of proving, by a preponderance of the evidence, that Mr. Chowdhury possessed the firearm "in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." *United States v. McAllister*, 272 F.3d 228, 233-34 (4th Cir. 2001), *cited with approval in Manigan*, 595 F.3d at 630.   Mr. Chowdhury, of course, acknowledges that he owned the handgun that was found at the pharmacy where his offense occurred, and that the handgun provided a measure of reassurance in operating the pharmacy safely in a high-crime neighborhood.   However, the handgun was related to these *lawful* parts of his conduct.   It bore no relation to the *unlawful* parts of his conduct -- that is, acting as a pharmacist without being qualified or licensed to do so (or submitting fraudulent insurance claims).   Indeed, this firearm had long been on the premises of the pharmacy – including at times when the licensed pharmacist was at the pharmacy, filling and dispensing prescriptions.   Consider that, had Pharmacist-1 not taken ill and ultimately stopped working full-time at ACP-1, and had Mr. Chowdhury never engaged in his offense conduct, the handgun would still be present at ACP-1, where it was lawfully used for protection.   Similarly, had Mr. Chowdhury not had access to a handgun, it would have made his crime no more difficult or any less likely, because the handgun did not help him act as a pharmacist without the proper qualifications or licensing.   In sum, the firearm had nothing to do with the offense to which Mr. Chowdhury pleaded guilty

The spatial relationship of the firearm's location to the offense conduct at issue also militates against application of the enhancement under U.S.S.G. § 2D1.1.  The government advises that it does not possess any photographs of the firearm at the time of the pharmacy's search by law enforcement agents; on information and belief, however, this firearm usually was in a safe in the back-office area of the pharmacy which contained check books, important business records, and cash.  When Mr. Chowdhury arrived at the pharmacy on February 19, 2016, in response to a telephone call from an inspector at the Virginia Board of Pharmacy, the safe was open, and the firearm, holstered, was lying on a shelf in the back-office area of the pharmacy – not at the counter where medications were dispensed.  Moreover, Mr. Chowdhury did not put the firearm on the shelf where the government reportedly found it, and he does not know who put it there; nor does he know who removed the firearm from the safe.  Before he was called to the pharmacy on the day of the search, Mr. Chowdhury had never before seen this firearm in the location it appeared when he came to the pharmacy on February 19, 2019 --  or anywhere else in the pharmacy other than in the safe.  On previous occasions, Mr. Chowdhury removed the firearm from the safe only for personal protection when personally delivering prescription medications to patients, and when making cash deposits at the bank.  (Both the pharmacy and its delivery radius were in a high-crime area of Fairfax County.)

If the Court agrees that the 2-level enhancement in U.S.S.G. § 2D1.1(b)(1) is inapposite, Mr. Chowdhury's total offense level would be 27 (rather than 29), corresponding to a range of 70-87 months.

### b.  Enhancement for Abuse of Position of Trust

The government has not established by a preponderance of the evidence that Mr. Chowdhury should receive a two-level enhancement for abuse of position of trust.  As a threshold matter, Mr. Chowdhury did not occupy a "position of trust" within the meaning of U.S.S.G. § 3B1.3.  As the owner of a pharmacy, he did not possess the type of fiduciary status or similar status or authority wielded by professionals such as an attorney acting as a guardian, a licensed physician dealing with patients, or a bank executive handling a bank's funds or a customer's finances.  *See* U.S.S.G. § 3B1.3 cmt. 1.  Nor did Mr. Chowdhury provide "sufficient indicia" to the public that he was a licensed pharmacist.   When dispensing prescription medications, for example, he did not wear a white coat like the licensed pharmacists; rather, he wore casual clothing.  Nor did he ever tell any members of the public that he was a pharmacist.

Moreover, in dispensing lawfully prescribed medications to pharmacy customers (albeit, without a license), he did not possess professional or managerial discretion; rather, in order to fulfill the medical needs of pharmacy customers, it was his obligation to precisely fill and dispense the medications as prescribed and, in that regard, had *no discretion*.   Even if, *arguendo*, Mr. Chowdhury occupied a position of trust, there was no abuse of that position.  The pharmacy customers to whom he dispensed lawfully prescribed medications received exactly the same medications they would have received had they been dispensed by Pharmacist-1.

The government's reliance on U.S.S.G. § 3B1.3 cmt. 2(B) also is misplaced.  Mr. Chowdhury was the owner of ACP-1.  Even if he sometimes used the initials of Pharmacist -1 or other pharmacy employees to dispense prescriptions, he did not exceed or abuse his authority in doing so.  Rather, he did with the knowledge of these individuals.

### 5.   Any Pertinent Policy Statement Issued by the Sentencing Commission

The defense is unaware of any policy statement issued by the Sentencing Commission that would be pertinent to the facts of this case.  It should be noted, however, that the Commentary to U.S.S.G. § 2D1.1 – which focuses on factors relating to the unlawful manufacturing, importing, exporting, or trafficking of drugs -- makes it additionally clear how distinguishable this case is from the types of cases for which this sentencing provision was devised.

### 6.   The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

The defense is unaware of any prior case in the Eastern District of Virginia ("EDVA") – or any other district nationwide – where the Department of Justice has criminally prosecuted a pharmacist (or pharmacy owner or operator) for unlawful distribution based solely, as here, on dispensing prescription medications without a license.  As a result, we cannot point the Court to any cases involving defendants who were similarly situated to Mr. Chowdhury.  EDVA cases involving defendants convicted of unlawful distribution of Schedule II controlled substances typically involve conduct such as forging prescriptions and selling them to a drug dealer;[10] operating a pill mill;[11] stealing blank prescription pads and facilitating the fraudulent filling of

---

[10] *Doctor's Office Manager Sentenced for Selling Oxycodone Prescriptions*, Department of Justice, U.S. Attorney's Office, Eastern District of Virginia (July 26, 2019), https://www.justice.gov/usao-edva/pr/doctor-s-office-manager-sentenced-selling-oxycodone-prescriptions.

[11] *Former Doctor Sentenced to Prison for Illegal Sale of Opioids*, Department of Justice, U.S. Attorney's Office, Eastern District of Virginia (April 26, 2019), https://www.justice.gov/usao-edva/pr/former-doctor-sentenced-prison-illegal-sale-opioids.

prescriptions for Schedule II controlled substances, including oxycodone;[12] supplying Schedule II controlled substances, including oxycodone, to a drug trafficking organization;[13] and writing and selling of prescriptions for controlled substances, knowing that the prescriptions were not for a legitimate medical purpose and beyond the bounds of medical practice, as part of a conspiracy to distribute oxycodone through northern Virginia.[14] Mr. Chowdhury's case presents no such aggravating factors.

Cases outside of EDVA involving pharmacy officials or personnel also involve conduct substantially more serious than Mr. Chowdhury's dispensing validly prescribed medications without a licensed pharmacist. *See, e.g.*, *Pharmacist Who Owned and Operated a Baltimore Pharmacy Pleads Guilty to Federal Drug Distribution Conspiracy Charges Involving Fraudulent Prescriptions for Oxycodone and Alprazolam*, Department of Justice, U.S. Attorney's Office, District of Maryland, Oct. 10, 2018: https://www.justice.gov/usao-md/pr/pharmacist-who-owned-and-operated-baltimore-pharmacy-pleads-guilty-federal-drug (licensed Baltimore, Maryland pharmacist knowingly filled fraudulent prescriptions for controlled substances, including large volumes of oxycodone);[15] *Two South Denver Pharmacists*

---

[12] *Former Medical Assistant Sentenced for Oxycodone Conspiracy*, Department of Justice, U.S. Attorney's Office, Eastern District of Virginia (Sept. 7, 2018), https://www.justice.gov/usao-edva/pr/former-medical-assistant-sentenced-oxycodone-conspiracy.

[13] *Doctor Sentenced to 30 Years for Oxycodone Distribution Conspiracy*, Department of Justice, U.S. Attorney's Office, Eastern District of Virginia (Dec. 18, 2017), https://www.justice.gov/usao-edva/pr/doctor-sentenced-30-years-oxycodone-distribution-conspiracy.

[14] *Arlington Doctor Sentenced to 15 Years in Prison in Oxycodone Conspiracy*, Department of Justice, U.S. Attorney's Office, Eastern District of Virginia (March 6, 2015), https://www.justice.gov/usao-edva/pr/press-release-6.

[15] The government accepted a plea agreement requiring the defendant to be sentenced to 51 months. *Pharmacist Who Owned and Operated a Baltimore Pharmacy Pleads Guilty to Federal*

23

*Plead Guilty to Felony Charges of Illegally Distributing Opioids*, Department of Justice, U.S. Attorney's Office, District of Colorado, Oct. 17, 2018: https://www.justice.gov/usao-co/pr/two-south-denver-pharmacists-plead-guilty-felony-charges-illegally-distributing-opioids (co-owners of Denver, Colorado pharmacy deliberately ignored red flags in order to fill illegitimate prescriptions for controlled substances, including oxycodone); *Central Kentucky Pharmacist Sentenced For Conspiracy To Distribute Oxycodone And Money Laundering*, Department of Justice, U.S. Attorney's Office, Eastern District of Kentucky, Oct. 27, 2017: https://www.justice.gov/usao-edky/pr/central-kentucky-pharmacist-sentenced-conspiracy-distribute-oxycodone-and-money (Kentucky pharmacist sentenced to eight years for filling forged prescriptions for oxycodone); *Defendants Convicted In Manhattan Federal Court For Illegal Distribution Of Oxycodone From Pharmacy In Yonkers*, Dept. of Justice, U.S. Attorney's Office, Southern District of New York, Oct. 1, 2014: https://www.justice.gov/usao-sdny/pr/defendants-convicted-manhattan-federal-court-illegal-distribution-oxycodone-pharmacy (pharmacy owner and supervising pharmacist at Yonkers, New York, pharmacy found guilty of conspiring to distribute large quantities of oxycodone to various individuals, including persons addicted to oxycodone and persons who intended to resell the drugs, pursuant to prescriptions the defendants knew to be stolen with, tampered with, or otherwise fraudulent); *Local Pharmacist Sentenced To 10 Years In Federal Prison For Filling Hundreds Of Fraudulent Oxycodone Prescriptions*, Dept. of Justice, U.S. Attorney's Office, Middle District of Florida, Mar. 12, 2013: https://www.justice.gov/usao-mdfl/pr/local-pharmacist-sentenced-10-years-federal-prison-

---

*Drug Distribution Conspiracy Charges Involving Fraudulent Prescriptions for Oxycodone and Alprazolam*, Department of Justice, U.S. Attorney's Office, District of Maryland, October 10, 2018: https://www.justice.gov/usao-md/pr/pharmacist-who-owned-and-operated-baltimore-pharmacy-pleads-guilty-federal-drug.

filling-hundreds-fraudulent (pharmacist and owner of Tampa, Florida pharmacy sentenced to 10 years for using hundreds of fraudulent prescriptions to dispense large quantities of oxycodone); *Five Sentenced in Broward Pharmacy Case*, Dept. of Justice, U.S. Attorney's Office, Southern District of Florida, Mar. 30, 2012:

https://www.justice.gov/archive/usao/fls/PressReleases/2012/120330-04.html (licensed pharmacists sentenced to 10 years for knowingly filling counterfeit oxycodone prescriptions for groups of drug dealers operating out of Miami, Florida, as well as prescriptions from "pill mill" doctors).

The above-cited prosecution of two licensed pharmacists in Denver, Colorado is particularly worth noting in connection with Mr. Chowdhury's request for a below-Guidelines sentence.  In that case, two pharmacists who filled prescriptions issued by John Littleford, a doctor of osteopathic medicine ("DO") – whose DEA registration authorized him to write prescriptions for controlled substances – pleaded guilty (like Mr. Chowdhury)  to knowingly and intentionally distributing a controlled substance, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).[16] *United States v. Eskanos*, Case No. 16-cr-00122-REB-4, Plea Agreement at 1, 4 (D. Colo. filed Oct. 17, 2018) (hereafter "Eskanos Plea Agreement"); *United States v. Callas*, Case No. 1:16:cr-122-REB-3, Plea Agreement at 1, 4 (D. Colo. filed Oct. 17, 2018) (hereafter "Callas Plea Agreement").   Unlike Mr. Chowdhury, however, the defendant pharmacists pleaded guilty to engaging in unlawful distribution not only "outside the usual course of professional medical practice," but also "not for a legitimate medical purpose."  Eskanos Plea Agreement at 4; Callas Plea Agreement at 4. In both cases, the defendants "deliberately ignored

---

[16] The two pharmacists also pleaded guilty to aiding and abetting under 18 U.S.C. § 2.

obvious red flags in order to fill the illegitimate prescriptions" that individuals presented which the DO had signed.  Eskanos Plea Agreement at 7; Callas Plea Agreement at 7.

In the Callas case, the defendant pharmacist admitted that he "knew or should have known that there was not a valid physician patient" relationship between the DO and the patient at issue, and that he also filled prescriptions for controlled substances "well before" they were scheduled to run out (overriding his pharmacy's prescription data software).  Callas Plea Agreement at 7-8.  He also ignored an admonishment from DEA concerning a patient's request for an early refill of a Schedule II controlled substance, proceeding to dispense the early refill.

In the corresponding Eskanos case, the defendant pharmacist admitted that he should have known a particular prescription for patient was not for a legitimate medical purpose "[b]ased on the dosage units and the morphine equivalencies."  Eskanos Plea Agreement at 7.  Eskanos also apparently failed to access information available to him in his pharmacy's computer network which would have made clear a history of excessive prescriptions of controlled substances for the same patient (who died from a drug overdose).  *Id*. at 7-9.

In both the Callas and Eskanos cases, the base offense level under the Sentencing Guidelines was 26, and the total offense level, after adjustments, was 21.  As in the case of Mr. Chowdhury, the Criminal History of both pharmacist defendants was Category I.  Eskanos Plea Agreement at 10; Callas Plea Agreement at 12.  The defense in Mr. Chowdhury's case is not privy to the sentencing court's reasons in the Callas and Eskanos cases, but in both cases the court sentenced the defendants to non-custodial sentences. Specifically, the court sentenced each of the defendants to a term of probation of five years and imposed a criminal fine of $15,000.  Judgment in a Criminal Case, United States v. Eskanos, Case No. 1:16-cr-00122-REB-4 (D. Colo. filed Mar. 18, 2019) ("Eskanos Judgment"); Judgment in a Criminal Case, United States v.

Callas, Case No. 1:16-cr-00122-REB-3 (D. Colo. filed Mar. 15, 2019) ("Callas Judgment").  In

both cases, the court also imposed special conditions of supervision which (1) prohibited them

from seeking a pharmacy license or the return of the license each of them had surrendered

pursuant to an agreement with the Colorado Board of Pharmacy; and (2) placed them on home

detention (to be enforced by electronic monitoring) for a period of eight months, to commence

within 21 days of sentencing.  Eskanos Judgment; Callas Judgment.

Mr. Chowdhury's offense conduct is considerably more benign than that of the

pharmacists in the Callas and Eskanos cases.  There is no evidence that, in filling and dispensing

prescriptions in place of the absent Pharmacist-1, he filled any illegitimate prescriptions,

prescribed excessive amount of medications, dispensed refills before their due date, ignored any

red flags, or otherwise acted for a purpose other than a legitimate medical purpose.

A below-Guidelines sentence for Mr. Chowdhury would be consistent with sentences

imposed in the Fourth Circuit generally, and specifically within the Eastern District of Virginia.

Underscoring again that Mr. Chowdhury's offense conduct does not fit the profile of the typical,

malign "drug trafficker," data from the U.S. Sentencing Commission indicates that 43% of drug

trafficking offenders in the Fourth Circuit received variances or downward departures (not

including 5K departures) in fiscal year 2018.  *U.S. Sentencing Commission, Statistical*

*Information Packet – Fiscal Year 2018 Fourth Circuit* at Table 10.  This data also indicates that

49% of drug trafficking offenders in the Eastern District of Virginia received variances or

downward departures (not including 5K departures) in fiscal year 2018.  *U.S. Sentencing*

*Commission, Statistical Information Packet – Fiscal Year 2018 Eastern District of Virginia* at

Table 10.  On a national basis, moreover, the data indicates that 48.8% of drug trafficking

offenders received variances or downward departures (not including 5K departures).  *Id.*

A recent case before this Court in EDVA – in which the defendant's offense conduct was considerably more serious than Mr. Chowdhury's -- is consistent with Mr. Chowdhury's request for a below-Guidelines sentence. In *United States v. Castro*, Case No. 1:19-cr-00169 (LMB), the defendant pleaded guilty to conspiracy to distribute 1 kilogram or more of heroin and 50 grams or more of methamphetamine (actual) in violation of 21 U.S.C. § 841(a) and 846. *United States v. Castro*, Case No. 1:19-cr-00169 (LMB), Plea Agreement ¶ 1 (filed June 20, 2019). According to the defendant's plea agreement, "the defendant was personally involved in the distribution of, or it was reasonably foreseeable to the defendant that his co-conspirators distributed in furtherance of the conspiracy, at least…10,000 kilograms but less than 30,000 kilograms of converted drug weight," corresponding to an offense level of 34 under the Sentencing Guidelines. *Id.* ¶ 5a. The defendant admitted to facilitating the operations of a Mexican drug trafficking organization operating in the United States. *Id.*, Statement of Facts ¶¶ 2, 4,7-10 (filed June 20, 2019).

In the Castro case, the Probation Office in EDVA calculated the defendant's Guideline range to be 41 to 51 months, based on a total offense level of 22 and a Criminal History Category of I. *Id.*, Position of the United States with Respect to Sentencing, at 5 (filed Aug. 30, 2019). The government sought a sentence of 41 months of incarceration, at the low end of the Guidelines range. *Id.* at 6. In support of its position, the government stated that the drugs the defendant admitted to trafficking "impose a significant harm on society. They are highly addictive drug[s] that destroy[] the lives of users and the families and communities that surround them. The quantity of illegal narcotics the defendant was transporting translates to tens of thousands of personal-use amounts." *Id.* at 5. In contrast, Mr. Chowdhury's dispensing of prescription medications without a pharmacist's license, pursuant to legitimate prescriptions and

while filling in for an absent pharmacist at his pharmacy, did not truly impose any significant harm on society.

The Court in the *Castro* case sentenced the defendant to a below-Guidelines sentence of 30 months of imprisonment (11 levels below the low end of the Guidelines range, with credit for time served. *Id*., Judgment in a Criminal Case (filed Sept. 6, 2019).  The Court imposed this below-Guidelines sentence even though the defendant violated the terms of his pretrial release by using cocaine before entering his guilty plea, causing the Court to vacate a previous order setting conditions of the defendant's release and to remand the defendant to the custody of the United States Marshals Service.  *Id*., Position of the Government with Respect to Sentencing, at 6. Order (filed July 1, 2019).

Similarly, Mr. Chowdhury respectfully asks this Court to impose a sentence considerably below the Guidelines Range determined by the Court.  Specifically, he asks for a term of imprisonment of no more than 12 months and a day, followed by three years of supervised release.  As in the above-referenced Callas and Eskanos cases in Colorado, this Court also could impose special conditions of supervision that would prohibit Mr. Chowdhury from ever seeking a pharmacy license, or operating a pharmacy, in the future.  The defense submits that such a variance is warranted due to the comparatively benign nature of Mr. Chowdhury's offense of conviction, the rehabilitation he has already demonstrated in his professional activities since the February 2016 closure of his pharmacies, and the application of other factors under 18 U.S.C. § 3553(a).

### 7.  The Need to Provide Restitution

As noted in the PSR, "the Probation Office [is] not aware of any restitution issues the Court needs to address in this case."  PSR ¶ 39.  Nor is Mr. Chowdhury financially able to effect

any restitution.  *See* Exh. 10 (Faisal Letter) (detailing financial predicament of Mr. Chowdhury's family since his arrest and detention).   As noted in the PSR, Mr. Chowdhury's total liabilities exceed his total assets, he has significant debt, he has a negative monthly cash flow, and he has consented in his plea agreement to the entry of a $500,000 forfeiture order.  PSR ¶¶ 88, 93, 95. Accordingly, he also does not have the ability to pay a fine.  *Id*. ¶ 95.

## IV.    CONCLUSION

For the reasons set forth below, Mr. Chowdhury respectfully asks the Court to impose a below-Guidelines sentence no greater than 12 months and a day's imprisonment, followed by a three-year term of supervised release.  He also respectfully asks the Court to forgo the imposition of a fine in light of the fact that he lacks the financial means to pay a fine.   Finally, Mr. Chowdhury respectfully asks that he receive credit for time served, that the Court recommend he be designated to a minimum-security camp at FCI Cumberland in Cumberland, Maryland, if consistent with Bureau of Prisons ("BOP")policy, and that the Court recommend him for participation in BOP's Residential Drug Abuse Program.[17]

---

[17] Mr. Chowdhury's alcohol consumption increased as a result of the government's investigation in this matter.  PSR ¶ 72.  While at the Alexandria Detention Center, he has attended Alcoholics Anonymous classes.

Respectfully submitted,

Defendant, Latif Chowdhury

By:     _____/s/
        William B. Cummings, Esq.
        Virginia Bar No. 6469
        Local Counsel for Latif Chowdhury
        Post Office Box 1177
        Alexandria, VA  22313
        (703) 836-7997
        Fax (703) 836-0238
        wbcpclaw@aol.com

        David H. Laufman, Esq.
        DC Bar No. 420162
        Wiggin & Dana LLP
        800 17th St. NW
        Suite 520
        Washington, DC  20006
        (202) 800-2477
        dlaufman@wiggin.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of September, 2019, I electronically filed the forgoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following registered ECF user:

    Raj Parekh, Esq.
    Assistant U.S. Attorney
    United States Attorney's Office for the Eastern District of Virginia
    2100 Jamieson Ave.
    Alexandria, VA  22314
    Raj.parekh@usdoj.gov

                        _____/s/
                        William B. Cummings, Esq.
                        Virginia Bar No. 6469
                        Local Counsel for Latif Chowdhury
                        Post Office Box 1177
                        Alexandria, VA  22313
                        (703) 836-7997
                        Fax (703) 836-0238
                        wbcpclaw@aol.com