IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LATIF MOHAMED CHOWDHURY,<br><br>Defendant. | Criminal No. 1:19-CR-203-LMB<br><br>Hon. Leonie M. Brinkema<br><br>Sentencing: September 27, 2019 |

## **UNITED STATES' POSITION ON SENTENCING**

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual (the "Guidelines" or "U.S.S.G."), hereby provides its position with respect to sentencing for the Defendant, Latif Mohamed Chowdhury. The Government has reviewed the Presentence Investigation Report (the "PSR") and agrees with the U.S. Probation Office that the Defendant's advisory Guidelines is 108 to 135 months' imprisonment.

The Defendant's reckless disregard for the health and safety of the customers of his pharmacies was motivated by his calculated desire to line his pockets and make as much money as possible. For the reasons set forth below, the United States submits that a **below-Guidelines sentence of 66 months' imprisonment** would be sufficient and not greater than necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a).

**I.    BACKGROUND**

Latif Chowdhury is a former pharmacy owner who abused the trust of his position to illegally distribute thousands of prescription medications, including opioids, without the ability, training, or license to exercise any medical judgment that he was properly filling and dispensing

controlled substances. The Defendant operated and controlled two now-defunct pharmacies known as Alexandria Care Pharmacy LLC ("ACP-1") and Alexandria Care Pharmacy Store #2 LLC ("ACP-2"). He has never been a licensed pharmacist and has no medical qualifications. Nonetheless, between August 2015 and February 2016, he fraudulently operated ACP-1 and ACP-2 by personally filling and dispensing medications without a licensed pharmacist on-site. The Defendant used the identities of licensed pharmacists, without their permission, to carry out his scheme.

The Defendant further admitted to fraudulently billing health insurance benefit programs, including Medicare and Medicaid, for refills of prescription medications that were not delivered to customers even though his pharmacies received payment for these prescriptions. He also submitted fraudulent health insurance claims in the names of pharmacy customers for medications that were not authorized by any physician, and were not dispensed to any of the customers, in order to unlawfully enrich himself through illicit profits generated by ACP-1 and ACP-2.

In addition, on several occasions, the Defendant dispensed Schedule II controlled substances in the names of minors, including children as young as 7 and 8-years-old, outside the usual course of professional practice. During the execution of a search warrant, a loaded Colt .38-caliber firearm that belonged to the Defendant was located in plain view on the pharmacy department shelves. The Defendant agreed to forfeit $500,000 as proceeds of his illegal conduct.

## II.     APPLICATION OF THE SENTENCING GUIDELINES

The Government agrees with the Probation Office's calculation of the total offense level as 31. PSR ¶ 53. Taken together with a Criminal History Category I, the applicable Guidelines range is 108 to 135 months. *Id.* ¶ 97. The Government offers the following observations regarding the two enhancement that were correctly applied by the Probation Office.

1. *<u>Firearms Enhancement (U.S.S.G. § 2D1.1(b)(1))</u>*

Application Note 11(A) states that this enhancement applies "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." The Fourth Circuit, in *United States v. Mabry*, 576 Fed. Appx. 155, 156 (4th Cir. 2014), stated: "The enhancement is proper when the weapon at issue was possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction, even in the absence of proof of precisely concurrent acts, for example, gun in hand while in the act of storing drugs, drugs in hand while in the act of retrieving a gun. Proof of constructive possession of the firearm is sufficient, and the Government is entitled to rely on circumstantial evidence to carry its burden." (internal quotations and citations omitted). The Court has also explained that the enhancement should be applied when a firearm is "readily available to protect" the drug traffickers or drug proceeds. *See United States v. Manigan*, 592 F.3d 621, 629 (4th Cir. 2010).

In *United States v. Ferretti*, 648 F. App'x 362, 363 (4th Cir. 2016), the defendant was convicted of conspiracy to distribute and possess with intent to distribute oxycodone. The Court noted that "Ferretti kept the handgun in close proximity to the drugs and cash proceeds from the sales, and, thus, the gun was readily available should the need arise to use it to protect either the drugs or cash." (citation omitted). The Court also recognized that, "the fact that Ferretti possessed the firearm pursuant to a valid concealed carry permit does not mean that he did not also possess the gun in connection with the drug conspiracy." (citations omitted). In *United States v. Trujillo*, 146 F.3d 838, 841 (11th Cir. 1998) – a case cited by the Fourth Circuit in *Ferretti* – law enforcement found narcotics, and in a separate room, a loaded pistol and the defendant's concealed weapon permit. The defendant argued that the connection between the firearm and narcotics was clearly improbable because he had left the firearm in a room separated from the narcotics, and because he

had carried the firearm legally as a security guard and pursuant to a permit. *Id.* at 847. The district court had rejected this argument, finding that this "just indicates that the gun was there for personal security in the event something went wrong in connection with the drug trafficking transaction." *Id.* The *Trujillo* Court affirmed the district court's application of the enhancement. *Id.*

Here, during the execution of the February 19, 2016 search warrant at ACP-1, a loaded Colt .38-caliber revolver handgun was located in plain view on the pharmacy department shelves. The Defendant admitted to law enforcement on the day of the search warrant that there was a firearm located on the rear shelf of the pharmacy, and that it belonged to him. This was a loaded handgun that was unsecured on the shelf of an illegally operating pharmacy – it is not comparable to "an unloaded hunting rifle in the closet" in the Defendant's residence, the example referenced in Application Note 11(A). Moreover, one of the Defendant's family members told the FBI during a voluntary witness interview that the Defendant kept the firearm at the pharmacy to protect the business and others in case of intruders "or if something weird happened."

While he may not be a conventional drug dealer, the Defendant did plead guilty to a drug trafficking offense – 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The Defendant had a choice to remove the firearm from the premises when he decided to operate his illegal business without a licensed pharmacist, but he decided otherwise. Even assuming *arguendo* that the firearm served as protection for the Defendant, it is still connected to the offense because the purpose of the firearm in that scenario is to protect and/or embolden the Defendant and his illicit business. The Defendant's admission to the Probation Office that he previously used the firearm "when delivering prescription medications to patients" further demonstrates that the firearm was connected to the offense, as he had no lawful authority to continue operating his pharmacies and delivering prescription medications to patients when a licensed pharmacist was not on-site.

   2. *<u>Abuse of Position of Trust Enhancement (U.S.S.G. § 3B1.3)</u>*

Application Note 2(B) states that this enhancement "shall" apply to "[a] defendant who exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification." That is precisely what the Defendant did in this case. As noted in paragraph 15 of the Statement of Facts, the Defendant used Pharmacist-1's identity and initials, without lawful authority, to dispense prescriptions from ACP-1 and ACP-2 from in or around August 2015 through in or around February 2016. On several occasions within that same period, the Defendant also used the identities and initials belonging to at least two other pharmacists, without lawful authority, to dispense prescriptions from ACP-2.

Alternatively, Application Note 3 states that this enhancement "also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not." Here, the Defendant perpetrated his fraud by falsely representing to pharmacy customers that he was a pharmacist and/or that a pharmacist had filled or dispensed their medications during the period of the offense conduct. For example, as noted in paragraph 12 of the Statement of Facts, the Defendant admitted to handwriting Pharmacist-1's initials on inventories and dispensing prescriptions under her name at ACP-1 while she was not working at the pharmacy. Additionally, paragraph 10 of the Statement of Facts notes that the Defendant fraudulently billed health insurance benefit programs for prescription medications that were not delivered to customers even though ACP-1 and ACP-2 received payment for these prescriptions. Thus, in making these misrepresentations to pharmacy customers and health insurance benefit programs, the Defendant assumed a position of trust that provided him "with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately." *See* Application Note 3 to § 3B1.3.

### III. A SENTENCE OF 66 MONTHS IS WARRANTED BASED UPON ALL OF THE SECTION 3553(a) FACTORS

#### A. The Nature and Seriousness of the Offense

Latif Chowdhury was the criminal mastermind behind the brazen conduct detailed in the Statement of Facts. The Defendant blithely violated his position of trust. His warped business philosophy led to him to loot at least $500,000 from health benefit programs and through the fraudulent filling of prescription medications. His actions resulted in the illegal distribution of thousands of dosage units of medications, including dangerous, addictive prescription opioids.

The essential nature of these crimes are grounded in the greed of the Defendant. That greed was sufficient to override his legal and ethical obligations to pharmacy customers and health care insurers. There are currently no known adverse health effects to specific patients from the Defendant's crimes. However, the important consideration here is not actual harm to the patients, but the Defendant's disregard for their health. They relied upon him to oversee his pharmacies with integrity and to ensure that all medications were dispensed by a licensed professional. Instead, the Defendant orchestrated a 7-month scheme that risked the health of his customers in order to unlawfully enrich himself. He should not assert that a pharmacist would have dispensed the same medications to the same customers that the Defendant did. That is a fanciful claim based on nothing but rank speculation. The truth is, no one knows the magnitude of the actual harm caused by the Defendant, but the substantial risk he posed to patients is incontrovertible. No reasonable person wants an unlicensed pharmacist to fill and dispense their medications or the medications provided to their children and other loved ones.

Pharmacies play a key role in our health care delivery system, and when operated responsibly, are of great value to the health of their patients and the well-being of the community. Filling and dispensing prescriptions require the judgment of trained professionals. For example,

pharmacists are trained to identify red flags that may indicate a controlled substance prescription is not being obtained for legitimate medical purpose, but rather for diversion or abuse. The public expects those in the pharmacy profession to serve as gatekeepers with respect to the distribution of controlled medications. *See, e.g.*, Am. Pharm. Ass'n, Code of Ethics for Pharmacists, at ¶ 17 ("The primary obligation of a pharmacist is to individual patients. However, the obligations of a pharmacist may at times extend beyond the individual to the community and society. In these situations, the pharmacist recognizes the responsibilities that accompany these obligations and acts accordingly."). The Defendant's actions made a mockery of the pharmacy profession.

Importantly, the Defendant's criminal activity was not limited to the sole unlawful distribution offense to which he pleaded guilty. As the Statement of Facts describe, the Defendant's conduct arguably violated at least five other statutes: 18 U.S.C. § 924(c) – use of a firearm in furtherance of drug trafficking (5-year mandatory minimum consecutive sentence and up to life imprisonment); 21 U.S.C. § 859 – distribution to persons under age 21 (maximum of 40 years and a one year mandatory minimum); 18 U.S.C. § 1343 – wire fraud (maximum of 20 years); 18 U.S.C. § 1347 – health care fraud (maximum of 10 years); and 18 U.S.C. § 1028A – aggravated identity theft (2-year mandatory consecutive sentence). While the government exercised its discretion to refrain from charging the Defendant with those offenses given his early acceptance of responsibility and other considerations specific to this case, the nature and seriousness of the Defendant's crimes merit a sentence of 66 months' imprisonment – which is still <u>42 months below the very bottom of his Guidelines range</u>.

      B.      **The History and Characteristics of the Defendant**

As demonstrated by his prior work history, Latif Chowdhury had the ability to make an honorable living using his college education and entrepreneur skills to serve his country and help

those in need. For example, the Defendant reported holding a Top Secret security clearance and working as a contractor at the Pentagon. PSR ¶ 86. However, notwithstanding his professional success and access to opportunities that are unavailable to many other defendants, greed led him to frequently operate his pharmacies without a licensed pharmacist on-site. The Defendant's history and characteristics should weigh in favor of holding him to an exacting standard. These were not crimes of necessity, yet he committed them to unlawfully enrich himself at the expense of unwitting pharmacy customers and health care beneficiaries.

The Defendant's conduct was also not driven by a momentary lapse in judgment or inadvertence. Rather, it was the product of repeated choices to engage in fraud and deception. As the operator, director, and manager for his pharmacies, the Defendant could have ceased the fraud at any point. Instead, his systematic crimes <u>only stopped after he was caught</u>. And while it is true that the Defendant does not have any prior convictions, it is equally true that he has a sophisticated criminal mind and clearly knew the consequences of his actions. Otherwise, he would not have deliberately and surreptitiously used at least three licensed pharmacists' identities to carry out his reckless scheme from at least August 2015 through February 2016.

The Government recognizes that the Defendant has endured periods of hardship in his life and acknowledges these circumstances. *See id.* ¶¶ 64, 66. However, the Defendant took advantage of the trusted relationships that he had built to dangerously violate the law at the expense of the patients that his pharmacies were entrusted to serve. His personal interactions in private life should not be this Court's principal consideration. Rather, it is the Defendant's serious crimes that should be the Court's lodestar. By all accounts, the Defendant is an intelligent individual who is fully capable of taking control of his own destiny. He had the power to make his own choices, and repeatedly made the wrong decisions (until he was caught) that have brought him before this Court.

### C. The Need to Promote Respect for the Law and Afford Adequate Deterrence

Given the ongoing opioid epidemic that is ravaging our communities, it is critical that other pharmacy owners and medical professionals who are contemplating flouting their positions of trust understand that the short-term financial gain is not worth the risk of significant punishment. Due to their highly addictive qualities, opioids such as oxycodone are frequently abused, which can lead to opioid dependence, addiction, and the use of illicit narcotics. For example, in 2016 – which is within the period relevant to the Defendant's conduct – approximately 2.1 million people in the United States suffered from substance abuse disorders related to prescription opioids. This Defendant, of course, is not solely responsible for a nationwide crisis. But his actions demonstrate, at a micro-level, how such unchecked conduct can help fuel this destructive epidemic.

Additionally, dollars spent paying for medications that are not authorized by any medical professional add to the financial cost of health care. The Medicare and Medicaid programs are public trusts that are funded by taxpayers. Many beneficiaries are among the most physically and economically vulnerable members of our society. Every dollar that the Defendant stole from these programs is a dollar that could have been used to provide valuable services to the elderly, the poor, and the disabled. Fraud committed against them puts their benefits in jeopardy. The Defendant's conduct reflects an unacceptable fleecing of these important public institutions.

Impersonating licensed pharmacists to dispense prescription medications and submitting fraudulent health insurance claims are highly lucrative schemes that are challenging to investigate and prosecute. The nature of the Defendant's criminal conduct is difficult for law enforcement to detect because it thrives on the particular expertise and skill of its perpetrator. The Court's sentence should reflect the scope and seriousness of this conduct, the need to deter others from

committing these potentially dangerous crimes, and the need to promote respect for the many laws that this educated and sophisticated Defendant flagrantly disregarded.

## CONCLUSION

For the foregoing reasons, the government believes that a sentence of 66 months' imprisonment would be sufficient, and not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:   /s/ Raj Parekh
Raj Parekh
Monika Moore
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
raj.parekh@usdoj.gov
monika.moore@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2019, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this matter. I further certify that I will provide a copy of the foregoing to the United States Probation Officer assigned to this matter.

 /s/  Raj Parekh
Raj Parekh
Counsel for the United States